FOURT, J.
 

 This is an appeal by Sheldon Builders, Inc., (hereinafter sometimes referred to as Sheldon) from the judgment of the trial court, sitting without a jury, denying its claims for money due for services rendered as a building contractor, for money had and received, and upon an account stated.
 

 Sheldon contends that there was insufficient evidence to support the trial court’s findings (a) that obtaining a loan in the amount equivalent to 100 percent of construction cost was a condition precedent to payment under the construction contract, and (b) that Sheldon was paid the sum of $297.70 by respondents. Sheldon further contends that parol evidence was improperly considered and that Sheldon was entitled to damages. These contentions are without merit.
 

 Appellant Sheldon is a construction company whose president, Sheldon Appel, is a licensed general contractor. Appel handled the entire transaction herein related with a partnership known as Trojan Towers (hereinafter sometimes called Trojan) which proposed to build an apartment building. Robert Joseph was the principal agent for the partnership in these negotiations; the other two partners were Nathan D. Pasaeoe and David Goodman. Of the three, Goodman was the partner with the best financial qualifications and only he had experience with apartment construction. On two prior occasions he had engaged in real estate development by furnishing the property in partnership with a builder who constructed the building on 100 percent financing without further investment by Goodman.
 

 Trojan owned a parcel of real property on Hoover Street in Los Angeles. On October 9, 1961, Sheldon entered into a contract with Trojan providing that Sheldon should construct a multi-story apartment house for a fixed fee of $20,000 which was, by subsequent written modification, increased to $22,000. These instruments form the only relevant written agreement
 
 *780
 
 between the parties, and it is the construction of this contract which constitutes the subject matter of the instant litigation.
 

 The basic agreement was the result of several months of negotiation during which both parties were represented by counsel. The agreement provides,
 
 inter alia,
 
 that “As part of his services hereunder, the contractor will aid and cooperate with the owner in obtaining the best suitable first trust deed construction loan and/or permanent financing at the best possible rate of interest, length of years and gross amount.” Appel acknowledged that he knew Trojan wanted 100 percent financing, meaning thereby sufficient funds to cover the entire cost of construction, that the partners looked to him to secure such financing, and that they could not proceed without it. By his own admission Appel encouraged Trojan in the belief that 100 percent financing could be obtained by telling the partners that he had obtained such financing upon previous ventures and occasionally had obtained financing even in excess of actual construction cost, thus returning to the principals some of their cost of land acquisition. In reliance upon Appel’s representations that 100 percent financing ivas within the realm of reasonable expectation, the partners executed the agreement of October 9, 1961, and the subsequent modification thereof, although on neither occasion had the parties determined the precise building design or specifications.
 

 Pursuant to their agreement, the parties commenced work on the project. Joseph described the basic student dormitory-type apartment he envisioned and Sheldon’s president consulted with an architect, Jack Chernoff, to obtain a design for the building. Over the next year Appel devoted substantial time to meetings with the partners, architect, building department and subcontractors; and his firm demolished the existing building on the proposed construction site.
 

 Although throughout this period both Sheldon and respondents sought financing, no commitment sufficiently large to cover the entire cost of construction was obtained. There is no evidence that the failure to obtain financing was respondents’ fault, or that the partners arbitrarily refused to accept suitable financing. Goodman, however, was forced to withdraw from the project in April 1962 due to personal financial losses which he incurred when his business partner absconded with funds.
 

 The parties initially envisioned a 57-unit building but the building department would accept no more than 54 units on the property and ultimately, when all efforts to produce ade
 
 *781
 
 quate financing for the larger building failed, Trojan considered a smaller, 19-unit building. In October 1963 Joseph obtained on behalf of Trojan a loan commitment on the 19-unit building in the amount of $165,500 and Sheldon was notified that Trojan found this financing satisfactory. At this point there is a conflict in the testimony. Appel testified that lie then agreed to proceed with construction, but he advised Joseph that Trojan would have to put in money in addition to the construction loan in order to complete the building. Trojan had paid $1,000 as called for upon execution of the contract, and since no further payment was due thereunder until the framework was completed, Trojan declined to make any earlier disbursement. Joseph contends that Appel refused to proceed until he received payment for some portion of the services previously rendered in connection with the larger building, and that only after his refusal did Trojan sell the property and assign the loan commitment to Chernoff and his partner.
 

 In any event, Trojan did not build the apartment, but the 19-unit building was built by Chernoff, with a partner, for his own account. Joseph did not disclose the transfer to Sheldon or its president, but called in September 1963, to request the return of the bids. It was not until Appel drove by the site in late December 1963, or early January 1964, that he discovered the building under construction.
 

 Sheldon thereupon claimed its right to the payment of its contract fee of $22,000 less the $1,000 paid when the agreement was executed. The trial court found that a condition precedent to performance under the agreement was the obtaining of financing to build the apartment building, that such financing had to be suitable to respondents, that respondents needed 100 percent financing which could not be obtained, and that the condition precedent had not, therefore, been satisfied. In the absence of a suitable construction loan, all further performance under the agreement was excused, and Sheldon was entitled to recover nothing by reason of its complaint.
 

 Appellant contends that the evidence was insufficient to support these findings since the plain language of the contract refutes the finding that 100 percent financing was a condition precedent to continuing performance by either party under the agreement, and that parol evidence was improperly admitted to alter the contract terms. The trial
 
 *782
 
 court correctly admitted parol evidence to determine whether Sheldon had performed all conditions precedent to its right to recover; to explain the extrinsic ambiguity in the agreement; and to show the existence of the collateral agreement, not inconsistent with the written agreement, that rendered the written agreement ineffective until the happening of the condition precedent.
 

 The construction contract specifically provides, as a material condition, that Sheldon should aid and cooperate with respondents in successfully obtaining a construction loan satisfactory to respondents. Sheldon had the burden of proving performance of all conditions precedent and on this issue evidence of all types was properly received. The contract was clearly ambiguous, as evidenced by the fact that even the attorneys who drafted it were unable to agree on the interpretation of the financing condition. As a result, the introduction of parol evidence to explain what the parties actually intended, by reference to surrounding circumstances, conversations and conduct, was clearly admissible. Moreover, respondents pleaded and proved, and the court found, that the financing was a condition precedent to the contract’s becoming effective. Parol evidence was thus properly admitted, not to vary or contradict the terms of the agreement, but to establish that a condition precedent existed which had to be fulfilled before the agreement could become valid, binding and effective.
 

 Although the execution of a written agreement supersedes all oral negotiations previous to or contemporaneous with the execution, since these are deemed merged in the instrument, nonetheless parol evidence may be admissible for limited purposes. “. . . The general rule is that oral agreements will not be permitted to change the express written provisions of a contract. However, should the taking effect of the contract, or any of its provisions, be contingent upon the happening of a future event, parol evidence may be admitted to show the cause of its non-performance either in whole or in part. This may necessitate the admission in evidence of a preceding or contemporaneous oral agreement.”
 
 (Paratore
 
 v.
 
 Scharetg,
 
 53 Cal.App.2d 710, 713 [128 P.2d 560];
 
 Gleeson
 
 v.
 
 Dunn,
 
 113 Cal.App. 347 [298 P. 119];
 
 Fontana
 
 v.
 
 Upp,
 
 128 Cal.App.2d 205 [275 P.2d 164] ;
 
 Campbell
 
 v.
 
 Taylor,
 
 189 Cal.App.2d 236 [11 Cal.Rptr. 271];
 
 Clyde Bldg. Assn., Inc.
 
 v.
 
 Walsh,
 
 248 Cal.App.2d 513, 516 [56 Cal.Rptr. 617].)
 

 The subject agreement demonstrated clearly that it
 
 *783
 
 was within the contemplation of both parties that the construction of the apartment building would be financed by a construction loan, as distinguished from funds to be furnished directly by respondents as owners of the property. Substantial eiddence discloses that the parties at all times understood and agreed that construction could not proceed without a construction loan to cover 100 percent of costs. It is undisputed that Sheldon cooperated, but since no one could obtain the required financing, the condition precedent was not fulfilled, and neither party became obligated to perform further.
 

 Appellant contends that the fee was a sum certain to which Sheldon was entitled even if the building was not constructed. Sheldon would have been entitled to payment of the fee, without performance, had Trojan terminated the agreement without cause or breached it in any way; neither event occurred. Since the only financing made available within a reasonable time failed to fulfill the condition precedent to rendering the construction agreement binding, either party was at liberty to consider the agreement terminated.
 

 Appellant further contends that Trojan sought to avoid the contractual obligation to pay the contractor’s fee by abandoning the project. The evidence fails to support this contention. As earlier pointed out, it was the opinion of the Trojan partners that it would be financially impossible for them to proceed without adequate financing. They did not intentionally abandon the project and disenfranchise Sheldon; they simply had no choice. The work of construction, through no fault of either party, never progressed to the point where any additional payment fell due the contractor. The contractor received $1,000 from Trojan to cover the preliminary work for obtaining financing. It would have been entitled to another payment when the framework was completed, but the parties were discharged from all further duty to perform in the absence of financing.
 

 The contract further provided that total construction costs should be deposited in a bank account established for that purpose, or that in lieu of cash the owner might provide a construction loan commitment for the full amount. In the event actual construction costs exceeded the estimate, Sheldon agreed to accept a note individually guaranteed by the partners. Appel advised Joseph that the partnership would have to dedicate funds in excess of the loan commitment on the 19-unit building because he could not, in effect, finance his full
 
 *784
 
 contractor’s fee. No construction account was ever opened, however, and Appel received no assurance that the contractor’s fee could be paid. By that time Goodman’s financial position had deteriorated causing him to withdraw and Appel felt the financial condition of the remaining Trojan partners was uncertain. Respondents who had invested substantial sums of money in the property and the project were then forced to sell the property to Chernoff, ostensibly because Sheldon withdrew. Substantial evidence supports the trial court’s conclusions, and we are not, therefore, at liberty to tamper with the findings.
 
 (Stromerson
 
 v.
 
 Averill,
 
 22 Cal.2d 808, 815 [141 P.2d 732].) Appellant, which construed its obligation to perform as terminated, is entitled neither to damages nor attorney’s fees.
 

 Finally, appellant contends that the trial court incorrectly determined that it received payment of its invoice for $297.70. The evidence, however, supports the trial court's finding that this bill was satisfied when Joseph sent to Sheldon a check for the full amount on which appeared the legend “Trojan Towers—paid in full.” Appel chose not to deposit that cheek, but retained it without notifying respondents that he would not accept it as payment in full even though at the time he received it the invoice for $297.70 was the only billing which Sheldon had sent Trojan. Where a check is presented as payment and not refused, it is the duty of the payee to return it without unreasonable delay if he does not wish to cash it, in order to avoid the presumption that it constituted satisfaction of the obligation.
 
 (Western Pac. Land Co.
 
 v.
 
 Wilson,
 
 19 Cal.App. 338 [125 P. 1076].) Respondents discharged their obligation by tendering the check which was accepted by appellant without complaint; appellant cannot now be heard to complain.
 
 (Hohener
 
 v.
 
 Gauss,
 
 221 Cal.App.2d 797 [34 Cal.Rptr. 656];
 
 Duncan
 
 v.
 
 Standard Acc. Ins. Co.,
 
 1 Cal.2d 385, 390 [35 P.2d 523] ;
 
 Conde
 
 v.
 
 Dreisam Gold Min. Co.,
 
 3 Cal.App. 583, 589 [86 P. 825]; Civ. Code, § 1501; Code Civ. Proc., § 2076.)
 

 The judgment is affirmed.
 

 Wood, P. J., and Lillie, J., concurred.
 

 A petition for a rehearing was denied November 27, 1967, and appellant’s petition for a hearing by the Supreme Court was denied January 3, 1968.